In re PALOMBO FARMS OF COLORADO, Debtor,

Angelo and Linda PALOMBO, Plaintiffs,

v.

NATIONAL ACCEPTANCE CORPORATION OF AMERICA, a Delaware Corporation, Lawrence Tayne, an individual, Bret Tayne, an individual, Irving R. Sevy, an individual, Robert Downes, an individual, Defendants.

Civ. A. No. 84-C-1009.
Bankruptcy Nos. 83-B-05435-C, 84-B-00052-J.

United States District Court, D. Colorado.

Aug. 9, 1988.

---

Jeffrey Cohen, Koransky, Friedman & Cohen, Denver, Colo., for plaintiffs.

Stephen E. Kapnik, Lohf & Barnhill, Denver, Colo., for all defendants.

Dan K. Webb, Scott J. Szala and Byron K. Mason, Winston & Strawn, Chicago, Ill., for Nat. Acceptance Corp.

## ORDER

CARRIGAN, District Judge.

Plaintiffs Angelo and Linda Palombo, and Palombo Farms of Colorado, Inc. ("Palombo Farms" or "the Farm") commenced this action alleging four claims for relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and thirteen state law claims.[1] Defendants are the National Acceptance Corporation of America ("NAC") and Lawrence Tayne, Bret Tayne, Irving R. Levy, and Robert Downes, (the "individual defendants"). Jurisdiction is alleged to exist under 28 U.S.C. § 1331 and 18 U.S.C. § 1964.

The complaint alleges the following material facts: Plaintiff Farm is operated by the plaintiffs Angelo and Linda Palombo. It is comprised of approximately 2,000 acres of rented ground for planting plus an 82 acre office/warehouse complex. The Farm also maintains a winter planting operation in Texas. Crops are planted in the fall each year using profits from the Colorado operation. The Texas crops are harvested in mid-winter and early spring and the proceeds from their sale are used to finance, in part, the initial spring planting in Colorado.

In 1982 the plaintiffs were in critical need of funds to operate the Farm. At that time they were contacted by Eugene Cass of the defendant NAC's Colorado office. NAC agreed to loan the Palombos the necessary funds in time for the 1982 planting season, and made a written formal loan commitment.

The initial loan transaction from NAC to the Farm was structured in three parts: (1) an installment note in the amount of 1.5 million dollars; (2) an accounts receivable rider to the security agreement detailing a method by which the Farm could borrow against accounts receivable; and (3) a blanket U.C.C. Article 9 "Loan and Security Agreement" securing all past, present and future loans by all tangible personal property of the Farm including but not limited to cash, receivables and other accounts. Together, the three transactions constituted the "Financing Arrangement" between NAC and the Farm.

During the autumn of 1982, a large quantity of onions in which the Farm had invested 1982 net profits, and which the Farm was warehousing for future sales, rotted and the Farm was forced to destroy them. Because the income from sale of these onions would have been applied to finance the Texas operation in the 1982–83 season, the Farm needed to borrow operating capital to make up the loss.

In mid-autumn through early winter of 1982, and early in 1983, Angelo Palombo met with the defendant Robert Downes, a NAC vice president, and they jointly prepared a 1983 cash flow projection. They

---

1. As discussed in the text of this order, the plaintiffs are Chapter 11 debtors in bankruptcy. The instant action was commenced by the plaintiffs' filing of the Complaint and Objection to Claim Pursuant to 11 U.S.C. §§ 502(b)(1) and 542; 18 U.S.C. §§ 1961 *et seq.* and, Pendent State Law Causes of Action. By stipulation, the trustee in bankruptcy is not asserting this action. Rather, the plaintiffs are proceeding in this action on their own.

determined that an $800,000 loan would be required to run the Texas and Colorado operations during 1983. Downes took the projections back to NAC's main office in Chicago for discussion. Before leaving, he allegedly told Mr. Palombo that the Farm would get the $800,000 loan. In reliance on this representation, Mr. Palombo began operations in Texas. He had no contact with NAC for two to three weeks thereafter. Several weeks later, the Palombos met with the Taynes and Downes in Chicago, and were informed that NAC would not loan them the $800,000. They were also told that NAC would try to do "something" for them in the future.

Two months after the Chicago meeting NAC informed the Palombos that they would receive no funds whatsoever because the collateral held by NAC was "insufficient." The complaint alleges that NAC made this representation even though: (1) the warehouse collateral was by itself allegedly worth approximately 6 million dollars; (2) NAC held a second deed of trust in the amount of 1.5 million dollars behind the first deed of trust of Connecticut Mutual Insurance Company of 1.6 million dollars; and (3) NAC held other Farm collateral.

The complaint further alleges that although the Palombos were in desperate need of the operating funds for Colorado and Texas, the defendant NAC, through the defendants Lawrence Tayne, Bret Tayne and Downes, remained adamant on the need for additional collateral and refused any additional loans. The complaint adds that the defendants' failure to provide additional loans as previously promised by Downes, and as impliedly represented at the Chicago meeting, caused a loss in the Texas operation that economically harmed the Colorado operation.

The complaint next alleges that approximately four to six weeks after NAC's refusal to loan more money, and at NAC's urging, the Palombos obtained, for use as additional collateral, approximately 20 acres of land owned by Angelo's mother. The complaint describes the loan transaction as follows: the 20 acres of real property in the Farm's vicinity was worth approx-

imately $400,000 to $600,000. Sylvia was to borrow $400,000 from NAC at 10% interest secured by the property. Thereupon Sylvia would loan the $400,000 back to NAC for the purpose of participating in a $400,000 loan to the Farm. The rate of interest that NAC would pay to Sylvia for the use of the $400,000 would be 10% thus resulting in a "wash" of the interest owed between NAC and Sylvia. The difference between the 10% and the "prime plus 4%" rate on the loan to the Farm was to be NAC's profit.

On July 12, 1983, the Farm started financing accounts receivable pursuant to the Rider for the 1983 season. Plaintiffs presented a demand note to NAC and received a check for *80%* of the face value of the receivables. However, when a second note was presented to NAC on the following day, the plaintiffs were presented a check for only *50%* of the face value of the receivables. When Angelo asked personnel at the NAC Denver office why the extra 30% was not forwarded to him in cash, he was informed that the Chicago NAC office had ordered the loans to be limited to 50% of the value of the scheduled receivables. Angelo was allegedly later told by Bret Tayne that the change was only temporary so that funds could be accumulated to cure alleged defaults in the Farm's accounts. Angelo allegedly was further informed by Bret Tayne that once the Farm was out of default or NAC felt that payments would be made, the Farm would again receive 80% of the face value of the receivables, and that the condition would last no more than "a couple of weeks." However, the account receivable financing was never restored to 80% of the face value of the receivables.

The complaint adds that as a result of the reduction in financing, the Farm was unable to pay all its creditors. On December 2, 1983, the plaintiffs filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Colorado.

According to the complaint:

"Based on their intimate knowledge of the Farm's cash needs and cash cycle,

NAC and the Individual Defendants knew or should have known prior to instituting the reduction to 50% financing, that the effect on the Farm of allowing it only 50% of its normal income as operating capital, when its cost of production was approximately 60 to 70% of income, could only severely reduce the Farm's projected production. NAC and the Individual Defendants also knew or should have known that such a drop in production would, in turn, eliminate a substantial portion of income and thus make it impossible to make payments as scheduled...." (¶ 60.)

The complaint further alleges that the plaintiffs were unable to operate the Farm successfully because of: (1) the burden of their prior note and the deprivation of 30% of the Farm's operating funds for the 1983 season; (2) the misrepresentation in the original loan commitment that the Palombos would receive 80% financing; (3) the misrepresentation on the face of each note as compared to the actual amount in cash received by the plaintiffs for each note; and (4) the misrepresentation that the Palombos would ultimately return to 80% financing. (¶ 61.)

The first four claims for relief assert violations of RICO.[2] Plaintiffs specifically contend that the defendants have deliberately, knowingly, and intentionally engaged in racketeering activity within the meaning of 18 U.S.C. § 1961(1) by committing two or more acts of mail fraud in violation of 18 U.S.C. § 1341.[3] They assert that the Farm, as a corporation, and NAC, are each an "enterprise" as defined in 18 U.S.C. § 1961(4).

Plaintiffs' first claim for relief alleges violations of §§ 1962(b) and 1964(c). It asserts that the defendants have, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest or control in the Farm as the enterprise in that the defendants removed the plaintiffs' ability to operate except as NAC permitted by its control of operating funds. (Complaint, ¶ 75.) Thus, the plaintiffs argue, the defendants directly and indirectly controlled most business decisions of the plaintiffs and fraudulently and systematically drove them out of business. (*Id.*)

The second claim for relief alleges violations of §§ 1962(c) and 1964(c). It asserts that the defendants have conducted or participated, directly or indirectly, through the Farm enterprise a pattern of racketeering activity by virtue of their economic control over the Farm. The third claim for relief also alleges violations of §§ 1962(c) and 1964(c). It asserts that NAC was the enterprise that the individual defendants used "as an economic weapon against the Plaintiffs to allow them to destroy, fraudulently and wrongfully, the Farm's business." (Complaint, ¶ 89.) The fourth claim for relief alleges violations of §§ 1962(d) and 1964(c). It asserts that the defendants have conspired to violate the provisions of § 1962(b) and § 1962(c).

The fifth through eighth claims for relief allege violations of the Colorado Organized Crime Control Act ("COCCA"), Colo.Rev. Stat. §§ 18–17–101, *et seq.* The ninth through eleventh claims for relief allege common law fraud. The twelfth claim alleges outrageous conduct. The thirteenth claim for relief alleges intentional interference with prospective business advantage. The fourteenth claim alleges negligent misrepresentation. The fifteenth claim alleges conversion. The sixteenth claim alleges

---

**2.** Section 1962(a), 18 U.S.C., makes it unlawful to invest funds derived from a pattern of racketeering activity in an enterprise engaged in interstate commerce. Section 1962(b), 18 U.S.C., prohibits the operation of or acquisition of an interest in an enterprise through a pattern of racketeering activity. Section 1962(c), 18 U.S.C., makes it unlawful for any person associated with an enterprise which affects interstate commerce to conduct or participate in the affairs of such enterprise through a pattern of racketeering activity. Section 1962(d), 18

U.S.C., states that it is forbidden to conspire to violate any of the substantive provisions of § 1962. *Saine v. A.I.A., Inc.,* 582 F.Supp. 1299 (D.Colo.1984).

**3.** The two alleged predicate acts of mail fraud involved: (1) the mailing of a notice of foreclosure of NAC's security interests in the Farm's accounts receivable on November 30, 1983; and (2) the mailing of a statement of accounts on or about September 30, 1983. (Complaint ¶ 69.)

common law fraud, and the seventeenth claim alleges promissory estoppel.

By order dated May 28, 1985, I dismissed with prejudice the four federal RICO claims and dismissed without prejudice the 13 state pendent claims. My ruling was based on *Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482 (2d Cir.1984). Subsequently that decision was reversed by the United States Supreme Court, 473 U.S. 479. Plaintiffs appealed and on May 1, 1986, the United States Court of Appeals for the Tenth Circuit reversed and remanded the action in light of the Supreme Court's *Sedima* decision.

Currently pending are the defendant NAC's and the individual defendants' renewed motions to dismiss pursuant to Rule 12(b), Fed.R.Civ.P., for failure to state a claim upon which relief may be granted. They have alternatively moved for summary judgment. The parties have briefed the issues and oral argument would not materially assist my decision.

In reviewing the sufficiency of a complaint when tested by a motion to dismiss, I must accept as true the complaint's allegations and view them in a light most favorable to the plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The complaint must stand unless it appears beyond doubt that the plaintiffs have alleged no set of facts that would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Defendants insist that the plaintiffs' RICO claims must be dismissed because the complaint fails to allege adequately: (1) a "pattern of racketeering activity"; (2) violations of the mail fraud statute; and (3) fraud, with requisite particularity. I shall begin by addressing the defendants' first contention. If I conclude that the complaint fails to allege a "pattern of racketeering activity," then I need not consider the remaining two arguments. Additionally, I would not need to consider the defendants' argument in support of summary judgment.

To plead a violation of RICO one must allege: (1) conduct, (2) of an enterprise, (3) through a *pattern* (4) *of racketeering activity*. *Sedima v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). A plaintiff must allege at least two acts of racketeering activity in order to establish a "pattern." 18 U.S.C. § 1961(5). In *Sedima* the Court noted:

> "While two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.' The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern." 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

The *Sedima* Court partially relied on a Senate Report that stated:

> "*The target of [RICO] is* thus *not sporadic activity.* The infiltration of legitimate business normally requires more than one 'racketeering activity' and the *threat of continuing activity* to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added).

In *Torwest DBC, Inc. v. Dick*, 810 F.2d 925 (10th Cir.1987), *petition for cert. filed*, the court held that a scheme to achieve a single discrete objective does not in and of itself create a threat of ongoing activity, "even when that goal is pursued by multiple illegal acts, because the scheme ends when the purpose is achieved." *Id.* at 928–29.

In *International Data Bank v. Zepkin*, 812 F.2d 149, 155 (4th Cir.1987), the court stated that "[t]o allow a "pattern of racketeering activity" to flow from a single, limited scheme "would undermine Congress' intent that RICO serve as a weapon

against ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." The court added:

"[A] single, limited fraudulent scheme ... is not of itself sufficient to satisfy § 1961(5).... If the commission of two or more 'acts' to perpetrate a single fraud were held to satisfy the RICO statute, then every fraud would constitute 'a pattern of racketeering activity.' It will be the unusual fraud that does not enlist the mails and wires in its service at least twice. Such an interpretation would thus eliminate the pattern requirement altogether."

*See also Miller v. Moffat County State Bank,* 678 F.Supp. 247 (D.Colo.1988) (no RICO claim stated where plaintiff merely alleged repeated racketeering acts in furtherance of a single scheme to defraud).

Thus if the complaint only alleges a single fraudulent scheme, then the plaintiffs have failed to allege a prima facie case under RICO.

■ Defendants contend that the complaint only alleges a single scheme with one goal: to defraud the plaintiffs of their assets and their use. While the complaint itself does not characterize the defendants' alleged misconduct in the form of two separate schemes to defraud, the plaintiffs suggest in their Response to Defendants' Renewed Motion to Dismiss, or Alternatively for Summary Judgment, filed on June 22, 1988 ("Response"), that the complaint alleges these two separate schemes to defraud: (1) the scheme to defraud the plaintiffs; and (2) the scheme to defraud Sylvia Palombo out of her land. Plaintiffs explain:

"The first scheme was to force Plaintiffs out of business while improperly maximizing Defendants' cash and collateral position, thereby permitting NAC to take over possession of all of Plaintiffs' assets. Secondly, Defendants made misrepresentations to Defendants with respect to the Sylvia Note, i.e., that it was in default and that they needed to reduce the accounts receivable financing from 80% to 50% for just a couple of weeks until the alleged default on the Sylvia

Note was cured. This ultimately resulted in Sylvia Palombo losing her property." (Response, at 22.)

Additionally, the plaintiffs argue that the continuity requirement of RICO is met. They allege:

"The threat of continuing activity in the present case can be inferred from the pre-printed forms utilized by Defendants and the accounting procedures utilized by Defendants to defraud Plaintiffs.... In the present case, the fraud would have continued indefinitely, but for Plaintiffs discovering what in essence was really happening." (Response, at 18.)

Despite the plaintiffs' attempt in their Response to describe the defendants' alleged misconduct in terms of two separate fraudulent schemes, I conclude that the complaint does not allege that a "pattern of racketeering activity" existed as that term has been construed by the Supreme Court in *Sedima,* and the Tenth Circuit in *Torwest.* Therefore, the complaint fails to state a claim under RICO. Plaintiffs essentially allege that the defendants reneged on promises concerning loans in an effort to obtain the plaintiffs' collateral. There is no continuity in this alleged plot but only a single scheme to defraud.

■ The use of Sylvia Palombo's land as additional collateral was merely an aspect of this single alleged scheme. As mentioned, *supra,* the plaintiffs do not assert in their complaint that the Sylvia Palombo transaction constituted an independent scheme on the part of the defendants to defraud her out of her land. While the plaintiffs' Response attempts to characterize the Sylvia Palombo loan as a separate scheme to defraud, I deem this as nothing more than an attempt to mold the alleged facts into a shape that will pass muster under the "pattern of racketeering" test. Plaintiffs are attempting to insert "square" facts in a "circular groove." The complaint does not involve a "pattern of racketeering," but rather it alleges ordinary fraud claims " 'best left to the state common law of frauds.' " *International Data, supra,* 812 F.2d at 155 (*citing Sedi-*

*ma,* 105 S.Ct. at 3293 (Marshall, J., dissenting)).

Because I conclude that the plaintiffs have failed to allege adequately the existence of a "pattern of racketeering activity," I need not address the defendants' additional arguments in support of dismissal, or their alternative request for summary judgment. Additionally, I conclude that the pendent state claims should be dismissed. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed. 2d 218 (1966).

Plaintiffs request that should this court grant the defendants' motions to dismiss, that the plaintiffs be given leave to amend their complaint to make it "more clear and concise with respect to the separate schemes pursued by [d]efendants since delineation of this pattern requirement as a result of post *Sedima* case law was not available when the [c]omplaint was initially drafted." (Response, at 23.)

Rule 15(a), Fed.R.Civ.P., provides in relevant part that once a responsive pleading has been served:

> "[A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."

Plaintiffs are cautioned that as with their complaint, the facts alleged in their Response do not allege adequately a "pattern of racketeering activity." Nonetheless, the plaintiffs will be permitted to file an amended complaint, subject to the conditions listed in the order below, and subject to Rule 11, Fed.R.Civ.P.

Accordingly, IT IS ORDERED that:
(1) Defendant National Acceptance Corporation's Renewed motion to Dismiss is granted;
(2) The individual defendants' renewed motion to dismiss is granted;
(3) Plaintiffs' complaint will be dismissed without prejudice unless within 15 days they file an amended complaint;
(4) Plaintiffs' counsel shall carefully consult Rule 11, Fed.R.Civ.P., and 28 U.S.C. § 1927, before advising the plaintiffs on whether to file an amended complaint.